This is our third case of the afternoon. People of the State of Illinois v. Kuldeep Chatha. For the appellant, Ms. Clarkquist, and for the appellee, Mr. McNeil. You may proceed. Good afternoon, Your Honor, Counsel. I am Carolyn Clarkquist, and I represent the appellant, Kuldeep Chatha. Chatha was convicted of possession of a controlled substance with intent to deliver. It was a Class I felony. We maintain that the State's evidence does not prove beyond a reasonable doubt that he knew that the substance contained in a product he was selling at his convenience store contained a controlled substance. The substance, or the product at issue here is something called Bulldog Spice. If you look at the record, you'll see there's photographs of it. It's a clearly packaged jar, professionally packaged. It has a label on it. It says, not for human consumption. Keep away from children. It doesn't list the ingredients. This product was sold in Mr. Chatha's store. What happened was, it was a controlled buy. The police had a confidential source go in and ask for a specific product, which notably was not the product that was in Mr. Chatha's store. The police were targeting a specific product called California Kush, I believe is what the name was. So, Mr. Cole, who was the informant, went and asked the clerk, do you have this product? And he said, oh no, we have something similar. And he offered him this Bulldog Potpourri, which I should note, looks apparently like a green plant-like material. There was jars of this on the counter. They were not hidden. There was one, six jars, I believe, that had a notepad over them. And the counter wasn't even something like this, where it could be partially hidden from your view. It's a countertop like any other counter in a convenience store that we've all been into. So, the clerk willingly, as you know from Dinesh Patel's appeal, sells this product to the informant. He scans it from a barcode. The barcode is on the side of the register. This is an important fact, because it shows that this product is being openly sold. There was no nefarious conversation that had to take place. The product was right there. Mr. Patel didn't go into some secret location to retrieve it. And the product was then sold to Mr. Cole. The police then test the product and then get a warrant. This is also important. They couldn't tell by looking at this product that it contained a controlled substance. The police testimony actually helps Mr. Chatham's case in the sense that the police testified that, no, you can't tell by looking at it or smelling it or any of its physical characteristics that it would contain a chemical compound that is illegal. So, what had to happen was they had to actually get it tested by a chemist. So, it's sent pretty quickly to the Illinois Police Crime Lab. And then they determine, oh, it does contain a controlled substance. They get the search warrant and they recover some of these jars at the store. In convicting Mr. Chatham, the trial court found that he did take measures to investigate this product, but he knew. That's what the trial court found, but the evidence isn't consistent with it. There's no evidence whatsoever, direct or circumstantial, that he knew this product contained a controlled substance in it. The evidence shows that at the end of 2011, he was selling other types of products, incense, it's called potpourri, and he learned from his wholesaler, a man named Muhammad, that a certain type of these products were going to be illegal because the law effective January 1st was outlawing 40 different chemical compounds. And so, Mr. Chatham complies with the law, he takes them off the shelf, he doesn't sell them. In January, the wholesaler comes to him and says, we have a new product that's legal and natural. So, he initially says no, and this is from the trial transcript, no, he doesn't want it. But then he finds out that customers are coming into the store saying that this potpourri is sold in Bloomington. And then, Mr. Chatham calls another local business called the Smokers Den and says, is this a legal product? The person who answered the phone said yes, that it is legal. And at that point, he asks Muhammad, the wholesaler, for a lab report. He receives one from the wholesaler, and on that, it says it's testing a specific type of product called California Chronic. However, at the bottom of the report, it says, also our brands include Bulldog, which is this product that he was selling in his store. He testified that, you know, he asked, is this the same product? And the wholesaler said yes, these are the same thing. None of this is disputed by the evidence at the trial. The state's basic arguments are twofold. One, somehow this product is hidden in the store. Again, I point out, like I demonstrated before, it's not hidden. It was on the counter, under a notepad. There was also some underneath where the register is. So it's not like there were some nefarious going on to get this product from the store. Anyone could have walked up, and it seems like you or I could have gone into this convenience store, asked for this type of product, and it would have been offered by the clerk. As this court also identified in Patel, it's important, too, that there was no evidence that this product was sold off the books, which could be indicative of him knowing that it contained a controlled substance. It seems like it was sold as with every other product that was sold in the store. Except the markup on beef jerky is apparently a lot less. One would be suspicious, based on the cost or the price of this item, wouldn't one not? I mean, I don't know when he paid the wholesaler for it. Or just the cost of it in the store. Well, but I guess the cost itself doesn't mean it's necessary. There are other types of alcohol, which are perfectly legal to sell, that are a higher-end brand, that would be more costly. I think an issue here, too, is that he did have it under the counter, and there was legal products for sale under the counter, as well. I think the photograph shows that this five-hour energy drink, which is legal, was also next to where these jars were. So, the price itself, again, I don't think that's indicative of the fact that he knew the product contained a controlled substance. That might have been something that was a consequence of what he paid the wholesaler for. We just don't know. The state could have presented that evidence at trial. They didn't do that. It's also noteworthy that the police testimony was that they didn't bother checking with the wholesaler to investigate him at all. Mr. Chaffin was extremely forthcoming. If you look at the videotapes, he's explaining how this product, he ended up selling it in his store. He gave the lab report. He made a trip to the police station. Part of what the state's argument is that he should have known from looking at this lab report, maybe it wasn't totally legitimate. What was the trip to the police station? That was when he was arrested, or when he went in. It was a couple days later. Initially, he said to the police, I think it was Detective Tyler who interviewed him. He said, I have a lab report showing that I got it from the wholesaler and brought it in. The other point I was going to make was that the, I apologize, I lost my train of thought. I guess what you had already identified in Patel, that some of these products were behind the counter. But that's something a store owner can choose to do. For instance, you pointed out the cost of it, $27. He said, more expensive things you want to keep behind the counter, which makes sense, because if you have shoplifters in the store, you probably don't want them shoplifting your more expensive items. Another thing, cigarettes can be behind the counter. Dirty magazines can be behind the counter. So the fact that this is behind the counter, and yet on the counter as well, we think shows that he didn't know that the substance itself within this product was illegal. There's no way he could know unless he tested it himself. He's not a chemist, and you know, the state's argument is he should have known. Well, that's kind of, can put a chilling effect on small business owners such as Mr. Chatham. Are they required to check the integrity of every product that they stock in their store? You know, if they get some Pillsbury flour, do they need to have it tested, make sure no cocaine is hidden in it, or some other adulterated substance within it? And there's some assurances here as a store owner that, you know, you're getting these products from your wholesaler. He had dealt with Mr. Muhammad before. He said, I got caps, T-shirts from him, those sort of items. He actually went out of his way to get a lab report, which, you know, he was under no obligation to do. Store owners aren't required to do that. He chose to do that because he's someone who complies with the law. There's no reason that someone like him, who's never been cited for alcohol to minors or cigarettes to minors, and took other products off his shelves when he learned that they were going to be banned, but then, you know, suddenly decided to sell this product and get a lab report for it. It just doesn't make any sense. There's just not enough evidence to say, beyond a reasonable doubt, that he knew. The standard is not that he should have known, and I don't even think, based on this evidence, he should have known. He got the lab report. The report said Bulldog is one of our products, that's what he's selling. He's checking with another local business. He also has customers saying, I bought it at another store. I mean, aside from testing it himself, I'm not sure what else he's supposed to do. As any convenience store, he has a lot of products, and again, I think it would have a selling effect on businesses if we required the business owner to test every substance that they're selling. What would be the inference in having a strict policy against selling it to minors? Well, I think the inference is that he's following along with what the label says.  It also says not for human consumption. But I think that could be said, if you look at a bottle of bleach, it'll say not for human consumption. That doesn't mean people aren't using it incorrectly. Or, for example, kids smell that, but that doesn't mean you can't sell it in your convenience store. And I think, by virtue of the fact that he doesn't sell it to children, shows that he's trying to comply with what the product says on it. You know, he's being a responsible individual. He has no record of being involved in any sort of illicit trade. There's just nothing there in this record that would suggest that he knew this product had a controlled substance. And I think that's obviously very well illustrated in the decision by this court in Patel, which identified several reasons why the clerk, and yes, we have the owner in this circumstance, he's the individual who decided to stock the product, but as this court identified, there's reasons why a store owner might put certain products at certain locations. And here, he said, I don't sell it to children, but it says in the container, keep out of reach of children. How do you believe this court's decision in Patel should apply here? Well, I think it should apply for the facts that were identified. For instance, that there's no indication that he, Mr. Chaff, instructed his clerks to sell this covertly. This court identified the fact that it's openly sold in the store. I mean, there was no secretive wink or something between Mr. Cole, the college student who bought the product, and the clerk. It was openly given to him. It sounds like anyone could have come in. So that's the first thing. Second of all, this court also pointed out that this isn't something that the police could even identify. There's no field test for it. You can't smell it and identify it. In fact, I think it was one of the officers at trial was asked, was there anything in the store that made you believe Mr. Chaffin knew this particular product contained a controlled substance? And he said, no. If the police don't know by looking at it, you know, how's Mr. Chaffin supposed to know? He doesn't know. And it's not that the burden isn't that he should have known. He doesn't have to disprove. He doesn't have the burden of proof. But here the state has to prove that he knew. And there's reasonable doubt that exists in this case for the reasons that… When you say the state had to prove that he knew, what is the object of that sentence? The state had to prove that he knew what? That the Bulldog Potpourri contained a controlled substance. He didn't have to… The state didn't have to prove beyond a reasonable doubt that he knew it contained a particular one. In this case, it was called AM22-01, I believe. But I would point out that when the chemist testified, she listed some other names for synthetic marijuana, which is what this compound is. There was two other ones that she testified to that are synthetic marijuana. It's JWH-018 and HU-210. And both of those are actually in the lab report. So, again, Mr. Chatham testified, I'm not a chemist. I don't know what this is. I got a notice at my other store saying don't sell certain products, so I stopped selling them. He got a lab report from the wholesaler. He relied on that. But in addition to that, he also checked with another business. You know, none of this is disproven by the state. The state has the burden of proof. They didn't present anyone from the smoker's den to say, oh, no, we never got a call from Mr. Chatham. They didn't present the wholesaler to say, I didn't give him this report. I told him you better not sell this. There's just nothing there. There's not enough to sustain his conviction in this case. Anything further? No, just a few minutes in rebuttal. Thank you. Very good. Thank you. Please, the court, counsel. First of all, there was specific testimony. I wanted to get this out. There's specific testimony from Detective Fritz that there was no bulldog in plain view from the public. The pictures show that there's boxes and stuff. Of course, those pictures are taken from behind the counter. He said, yes, there was six bulldogs on the counter. They were covered with this, and they were on the other side of the register. He specifically testified that those were not in plain view from where somebody in the public would be. So if they were in plain view, then what? Well, the plain view thing is, again, of course, it's well-settled knowledge. It's hardly ever proven by direct evidence. It's always circumstantial. Here, the fact that the defendant decided not to put this stuff on public display. Well, how should this court view the steps that the defendant, Mr. Chatha, if that's how his name is pronounced, took to try to determine whether this was an illegal substance? One, the trial court didn't have any obligation to believe Mr. Chatha. And two... So you don't think the record... Did the court indicate a lack of belief in his testimony? And if so, why? The court indicated, I'm going to use the exact language, like willful ignorance, I think was the term. Well, that was the court's conclusion. Did the court indicate that what the defendant testified to as the steps he took weren't believable? I think that's what they were getting at when they said the defendant was sort of being willfully ignorant of the situation. Again, no reasonable businessman would believe this wholesaler thing. It didn't even have a mailing address. It didn't have a legible signature. It didn't have a printed signature. But he received that from someone he trusted and had prior dealings with. I mean, so he says that he brought it to the police the next day. The police couldn't verify where he got this letter or anything like that. It had two different dates on it, and it contained lab results for a product that wasn't listed on the cover. Let's assume you're counsel for this guy who's running a convenience store in Lexington, Illinois. And he says, here's this product. There's a demand for it. I think you can sell it at some profit, but I want to make sure I'm not – there's some suggestion it might be illegal, and I want to make sure I'm not doing anything that would be illegal. I would do specifically what this so-called letter said to do and contact my local representative, or at least maybe the police, not a smoke shop in town and deal with whoever is the first person that picks up the phone. Again, that's not a – that's not a really due diligence in finding out this stuff is illegal, especially when this guy – first of all, him even calling and taking steps shows that he had some suspicion that this was not on the up-and-up. Two, he knew – He didn't sell anything like this at his Morris store for two months because of a city ordinance, a village ordinance. Okay, that's currently, yeah. But he also didn't even sell it in this Lexington store for the prior two months because of a statewide ban. So he knew that this spice stuff had become illegal at the beginning of 2012, and he still sort of goes through the motions, I guess you could say, if you want to believe him, that this stuff's legal only by way of a letter from who knows who that he says is from the wholesaler and a call to a smoke shop, which, again, the court was under no obligation to believe. The court saw Mr. Chatham testify.  We received information from his supplier. We received this correspondence from wholesale – S.A. Wholesale LLC. You know, we – just pause it for a moment. We see a lot of drug cases in this court. I know you do as well, Mr. McNeil. This doesn't smack of any of those. We don't have letters from suppliers. We don't have bottles looking like they're put in by regular manufacturers. We don't have wholesalers who are vouching for products. This is hardly that situation. This is a unique situation. It's an evolving situation with this kind of drug. Why shouldn't what this court held in Patel apply here as well? Because Patel specifically noted that the defendant wasn't the owner of the place. He didn't buy the stuff. Well, that wasn't necessarily the distinction. That was an observation. Well, it wasn't a distinction then. It was an observation then. He wasn't the owner. It was the justification. Okay. But he also, in Patel, the two things I just pointed out weren't present, really. There was no letter received. There was no assurances from a wholesaler. None of that occurred. True. Why isn't that more arguably exculpatory than the situation in Patel? When it comes to the question of the proof beyond a reasonable doubt that the defendant had knowledge that this was an illegal substance. It is arguably exculpatory, but the trial court did not believe that it was exculpatory here. They did not believe the defendant did the requisite due diligence or had any intention of actually discovering the legality of this product. Except the trial court looked at the letter before also. Correct. And says, from the wholesaler, and says, you know, well, you've got this information. But, by the way, down at the bottom, a different substance was tested. Correct. I mean, from a skeptic's viewpoint, from a reasonable businessman's viewpoint, a product that just became illegal two months ago, and then he gets this letter, that simply isn't enough. That's a bury your head in the sand kind of approach. Well, except at the bottom it says one of our other products is. It also says, well, one of the other products. How many drug dealers get letters from suppliers talking about what it contains? And, by the way, if you're concerned that this might be illegal, it isn't, and here's why. Have you ever seen that? In all of the hundreds of cases you've been involved in. This is my first case involving synthetic cannabis. But you've seen lots of drug cases, Mr. McNeil. True. We haven't had letters from suppliers claiming, telling you these people, oh, forget about this. There's no problem here. It's okay. Again, it would be hard to pull the wool over your eyes for something like cocaine or marijuana or something like that to really have a reasonable belief that that stuff's illegal. The presumption that you're involved in illegality is pretty strong. And here, the major fact is the stuff was not on display. There's a reason. And defendants argue that, well, it was rung up just like any other product. Real products have barcodes. Not every product has a little barcode on the side of the register that gets scanned and then no receipt given to the customer. I think Mr. Chathas said he paid $9 for it and sold it for $27 or something like that. Again, not every product is 300% How should this court view things given that the crime, the substance that was made criminal within weeks earlier, was in the Public Act 97193 couched in terms that might as well be in Greek or Chinese as far as being intelligible to anyone who speaks English. There's some chemical formula set forth. A bunch of different specific chemicals. To be specific, it's any compound structurally derived from 3-1 naphthol pyrole by substitution at the nitrogen atom of the pyrrole ring by alkali, alkyl, alkenol, and it goes on. But you get my point. Short of someone with an advanced degree in chemistry, how is any of that even intelligible? Apparently, it was enough for this business owner to know that the synthetic cannabis became illegal at the beginning of 2012. He'd be concerned. You'd hear it on the streets. He was concerned enough to stop selling it. And then he takes these minimal, almost facade of looking for the legality in the form of calling a smoke shop. What else would you have him do? Put it on display in the store. Well, no, no. If he's saying this is a facade, it's not really believable, and it's just going through motions. Make it in public. What should he have done to satisfy himself more than he did in this case? Contact his local representative as the cover letter instructs. Contact who? His local representative. His wholesaler? No, that's what the wholesaler letter instructs him to do if he has any questions. Well, no. This guy, Mohammed, was the guy who was his wholesaler, and he got the letter from someone else who was the manufacturer. So he contacted Mohammed. Mohammed says, no, it's okay. And he got the letter from the manufacturer, as I recall. No, I think that... Now, has he got to do more? Does he... I think the letter came from Mohammed, too. Are you saying he's got to submit it to a chemist for an examination? Is that his requirement? All he has to do is pick up the phone and call a local representative, a local authority, or if he... You mean like his state representative? Sure. You mean the state representative is going to know? Well, that's what the cover letter says to do. Something, a product that was made illegal two months ago, a guy selling it under the counter in his store, a couple months later... So he calls up... This is in McLean County. He calls up Representative Dan Brady, I guess might be his rep, and says, gee, I have this substance here. I want to sell it. Representative Brady, is it okay? That's the advice that the wholesaler gave him. Well, what advice would you give him? Call the police. The police will know? Well, apparently they do. Say, hey... After it was tested. I got this bottle here. Would you test it for me? I don't think they're going to. Again, we're basically saying that a bury-your-head-in-the-sand approach would work here. Well, no. I'm asking what would be the reasonable... Do you think if he showed up at the police station with a bottle of this stuff and said, will you test this for me, that we said, sure, we'll be happy to, Mr. Chada? Got nothing else to do? Well, if I was a business owner and I knew that this product... I was scared enough to take this product off my shelf two months prior, and then my wholesaler comes around again, I would make sure that it was legal before I started selling it. And especially if I didn't want to cause the reasonable inference of selling an illegal product or knowing that I'm selling an illegal product, I would at least put it on public display in my store. Was it the exact same product that he took off the shelves? I didn't think it was. I mean, it was this incense that looks a lot like marijuana. I mean, from the same wholesaler. It might be called a different name. But, again, the trial court... the reasonable inference that he had the knowledge that he was selling something illegal, controlled substance, was... it was a reasonable inference to make. How about these... it was a concern. And based upon the steps he took, his concern dissipated. But you have to prove beyond a reasonable doubt it wasn't a concern. He knew. He knew this was illegal. I think that the fact that the public... it was not in public display, a reasonable inference can be made that he knew that this stuff was a controlled substance. So if it was on public display, you wouldn't be here and the case would be not guilty? Clearly. If it's on public display... So do you dispute that there were cans or containers of this product on the counter and that they were covered by a notepad? As I said, there's specific testimony... yes, and there's pictures in the record. Notepad just like this, actually. It's on the other side of the cash register. On cross-examination, Detective Fritz was asked specifically about the six canisters on top of the counter. Were those available... were those viewable in plain view of the public? He said no, there was not. So they were on the counter? Yes.  Yes. If you look at the picture in the record, it's next to the cash register, but it's also... there's stuff built up, and there's this over the top of it. It would not be viewable to anyone by the public on the other side of the counter. A jury in a criminal case is given the instruction, you may take your common experiences in life into consideration when you evaluate the overall evidence. A common experience in life... in that context, I'm wondering about how it is that we have here a box of containing... it looks like from a manufacturer... containing glass-sealed little containers with this product in it. And the reason I ask that is, that seems to be totally inconsistent with my... I hate to say it, 46 years now experience with the criminal justice system. I literally have never seen anything like this in the hundreds, probably thousands of drug cases I've seen or read about or been associated with in some capacity, where such a packaging ever occurs. Doesn't that bespeak of a lawful product to most people? Again, a trial court... a jury, like you said, can take its common experience. I think this product is commonly sold, professionally packaged and commonly sold, as instance, in stores. It's routinely made illegal state by state. I don't know how many are now. But it is professionally packaged, as the record shows. However, if it's professionally packaged, why isn't it up on the shelf? Every other product, as Patel says, well, there's many reasons for not having certain legal products on public display, like alcohol, tobacco. Here, the defendant admits, and the pictures show, that alcohol and cigarettes are on public display. They're behind the counter, but they're viewable. As is the pipes that you regularly smoke, people regularly smoke this stuff out of, or that, or marijuana, or whatever. Those pipes are on public display as well, even in the display case, the locked display case. Notably absent anywhere on public display is this stuff. Clearly, looking at this evidence, in the light most favorable to the prosecution, a reasonable inference can be made that the defendant had knowledge of this, having a controlled substance. The idea that it might be abused, as a product that could be abused, is putting someone on notice. What about a product like paint thinner, for instance, or the Xerosol cans? Should that put the hardware store on notice, that these are products which can be abused, and therefore they shouldn't be sold, or it might be illegal to sell them? If the legislature wants to make a law banning that stuff, I guess that'd be something that the hardware stores would have to deal with. As of now, that's not on the books. This one is. In fact, this one was common knowledge even to the defendant here. He knew that this synthetic cannabis was illegal. That's why it's under the counter. That's why it's not in public view. A reasonable inference can be made that he knew he was selling a controlled substance. Are there any other questions? Why isn't it a reasonable inference for him to think that the manufacturers are ahead of the legislature? If the trial court found it the other way, I guess it would be. All reasonable inferences at this stage, of course, need to be resolved in the light most favorable to the prosecution. They weren't in Patel. We reversed. So, you know, you're right. It's a very high threshold, but it's not an impossible one. Also, Patel compared this to the truck driver driving someone else's stock. Here, the defendant's the owner. The defendant's the guy who stocked the truck. Clearly, he has the knowledge of what he stocked the truck with. He has the knowledge of the legality of the product he stocked his truck with. And especially if the defendant stocked the truck underneath fake floorboards, that would show a reasonable inference that the defendant had knowledge that this was a controlled substance. And that's the distinguishing factor between this case and Patel. Thank you, counsel. Rebuttal? Putting this product on display doesn't change the fact that the compound within the product suddenly becomes legal. If you look at the product itself, it looks like oregano. You know, the state's argument, on public display, not guilty. Well, the legal compound is still in that product. The element here is knowledge. He shouldn't get punished for seeking out a lab report. That does say Bulldog is one of our products. And yes, it says, contact your local representative. Well, guess what? The police came in here. They looked at the substance. They couldn't figure out it contained one of these chemical compounds that had to be sent to a chemist. So had he done that, which he was under no obligation to do, that wouldn't have helped him. So he's effectively getting punished here for taking extra measures, explaining how he ended up getting this product in his store, which not all these, and this court noted in Patel, not all these potpourris are illegal. Are the people who are manufacturing this trying to stay a step ahead of all these chemical compounds that get outlawed? Perhaps. But Mr. Chaffa stocking this product in the store when he's taken all these measures, which he didn't have to do. There's no statute that says the shopkeeper has to test every product that he stores in his, or stocks in his shop. There's just nothing here that shows that he knew, beyond a reasonable doubt, it's not proven, that he knew that this product contained a particular chemical compound. Forty different chemicals were outlawed effective January 1st. When he found out some compounds were going to be outlawed in December, he removed those products from his other stores. I think he got a letter in the Morris store saying, don't sell us. What did he do? He stopped selling it. So then the wholesaler says, we have a new legal product. Well, that would tell anyone that they've made an adequate substitute that complies with the law. He checks around. Okay, it's sold somewhere else. The wholesaler, I do say, you know, the state said that, regarding the wholesaler, the detective said the police did not try and verify with the wholesaler. That's where he's getting the product from. So if they really want to get someone, go to the source. Mr. Chaffet is a businessman who's trying to run a convenience store. It's got so many products, including six of these that are on the counter. I think he says, too, in his testimony, I'm a businessman. I want to sell products. I mean, there's no reason to hide it. Someone came in and asked for something different. That was the target. They're not selling that, but they got what they thought was an adequate legal substitute that the clerk willingly offers to Mr. Cole. It's not hidden. There's a big difference between what's going on here. Everyone's been in a convenience store. There's usually a lot of stuff on the counter. If you're hiding drugs in your store, I don't think it's going to be on a counter with a notepad on top of it. And for those reasons that we've cited in our brief, also for those reasons you have already identified in Mr. Patel's case when you reversed his conviction, we would ask that you find that the state has not met its burden of proof of showing that Mr. Tatha knew beyond a reasonable doubt that this particular product contained a certain chemical compound. Thank you. If this was a jury trial and all the same evidence came in and the jury found him guilty, they'd be evaluating his credibility just like the trial court did. If the trial court evaluates his credibility and concludes that however it is that we make our conclusions based upon body language, use of language, answering questions directly, those sorts of things, and thinks this guy knew something was hinky about the product and I just don't believe that he went to the efforts that he suggested. But he proved it. I mean he said I went and got a lab report. He produced a lab report. Also, Mr. Tatha, you can see in his videotape statement, I don't know how he appeared at trial, it was in photograph, but he's explaining. He's very forthcoming. The state could have gone and sought out Mr. Muhammad, the wholesaler. I'm not sure what else. He's effectively getting punished for taking extra measures that shopkeepers are not required to do. And when I say punished, I mean with regard to the lab report. So it doesn't look as sophisticated as something you might get from DuPont Chemical or a company like that. Well, he's a small business owner. He went beyond what was required of him by the law. The wholesaler said we have a new legal product, adequate substitute for the old product that he willingly took off his shelves. And then he, you know, there's nothing that the way it was sold. There's no drug case where I've seen where they're scanning it on a barcode. You know, it's getting mixed in with all the other merchandise. The only other question that I have is one that neither of you probably are able to answer. Given the delays in state crime labs, I'm trying to figure out how hours later there was the indication from the crime lab that says this is bad stuff. I don't know how they could do it so quickly. I think they put them on notice. I think it says that they knew, the police I believe said in the record, that they knew they were going to go into the store and they thought they were getting a different product. Is this right? It seemed to me like the chemist knew something was going to be coming to him. But that would be the case every day because they know there's going to be a murder or a rape or something. They're going to get evidence every day that somebody wants to evaluate. Quickly. Well, it's an interesting thing. It's beyond mine. Yes. Thank you.